MARIYA MELKONYAN (SBN: 261473)
Law Offices of Mariya Melkonyan
450 North Brand blvd, Suite 600
Glendale, California 91203
Email: Mariya@Melkonyanfirm.com
Telephone: (424) 901-3131

# THE UNITED STATES DISRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | Case No 2:24-CR-00348-SVW |
| Plaintiff, | |
| vs. | |
| | **DEFENDANT'S SENTENCING** |
| SUSANNA HARUTYUNYAN | **MEMORANDUM WITH EXHIBITS** |
| | Date: November 17, 2025 |
| Defendant. | |

TO THE HONORABLE STEPHEN V. WILSON, JUDGE; THE CLERK OF THE COURT; AND TO ASSISTANT UNITED STATES ATTORNEYS:

　　PLEASE TAKE NOTICE that defendant, Susanna Harutyunyan, by and through her attorney of record, Mariya Melkonyan, submits the following position re: sentencing.

　　This position is based on the attached memorandum of points and authorities, all files, and records in the case, and on such further evidence or argument as may be presented at the sentencing hearing.

Dated: November 09, 2025

　　　　　　　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　　Mariya Melkonyan
　　　　　　　　　　　　　　　　　　　　　　　　Attorney for Susanna Harutyunyan

# I.

# INTRODUCTION

On July 7, 2025, Susanna Harutyunyan, pled guilty to Count 18 of the Indictment, which charges that on November 26, 2021, Harutyunyan violated 18 U.S.C. § 1957(a)(1)(B)(i): Monetary Transactions in Criminally Derived Property over $10,000.00.  It should be noted that Susanna Harutyunyan was only charged with counts 11, 13, 16, 17 and 18 in the 24-count indictment and counts 11, 13, 16, and 17 are to be dismissed at sentencing.

The following Sentencing Guideline Factors were agreed upon by the parties: a base offense level of 8 pursuant to USSG §2S1.1(a)(2); **a 14** or 18-level increase pursuant to USSG §§2S1.1(a)(2), 2B1.1(b)(1)(H)/(I) for value of laundered funds of more than $550,000 but less than $3,500,000; a one-level enhancement for money laundering enhancement pursuant to USSG §2S1.1(b)(2); and a three-level reduction for acceptance of responsibility pursuant to USSG §3B1.1. (ECF No. 182, plea agreement page 15.)

Among others, the parties agree they may argue for or contest the application of an up to **four-level reduction for a mitigating role** under USSG §3B1.2. (plea agreement page 15.) The parties reserve the right to argue for a variance outside the Sentencing Guidelines range based on the factors set forth in 18 U.S.C. § 3553(a). The United States understands that defendant intends to make such arguments specifically related to her role in relation to codefendant Panosyan and based on her family circumstances as the parent of a minor child. (Plea agreement, page 15.)

**The government agrees not to seek a term of imprisonment above the applicable Sentencing Guidelines range, provided that the offense level used by the Court to determine that range is 14 or higher**. ((ECF No. 182, plea agreement page 7.)

The U.S. Probation Office's Pre-sentence Report (PSR) establishes defendant's Total Offense Level to be 20, that the defendant falls within Criminal History Category 1, and recommends the lowest time within level 20 of 33 months. However, the probation department did not take into account a 4 level reduction for a mitigating role and added 16 points for the loss amount instead of the 14. Therefore, the probation departments calculation overstated the true criminal level by 6 points.

Ms. Harutyunyan respectfully requests that her offense level be calculated at level 14 based on her mitigating role and the accurate loss amount. She **respectfully asks this Court to impose a 15-month sentence or less.** The accurate calculations should be as follows:

| | | |
|---|---|---|
| Base Offense Level: | 8 | U.S.S.G. § 2S1.1(a)(2) |
| Value of Laundered Funds (More than $1,500,000 but Less than $3,500,000) | +14 | U.S.S.G §§2S1.1(a)(2),2B1.1(b)(1)(I): . |
| Transactional Money Laundering: | + 1 | U.S.S.G. § 2S1.1(b)(2)(A) |
| Mitigating Role | - 4 | U.S.S.G. § 3B1.2. |
| Acceptance of Responsibility: | - 3 | U.S.S.G. § 3E1.1 |
| Zero-Point Offender Adjustment: | - 2 | U.S.S.G. § 4C1.1 |

Total Offense Level: 14

## II.

## STATEMENT OF FACTS

**A.    MS. HARUTYUNYAN'S FAMILY AND PERSONAL LIFE, AND THE CIRCUMSTANCES LEADING TO THE INSTANT OFFENSE**

**Early life:**

Susanna Harutyunyan was born in 1985, in Yerevan, Armenia, where she grew up amid hardship and instability. (Exhibit A, Armenian/Russian birth certificate) Her mother abandoned the family when Susanna and her sister were young, leaving their father to care for them with the critical help of their grandparents. The family endured poverty and the hardships of war, often lacking food, water, and electricity. These early experiences instilled in Susanna both resilience and a lifelong fear of losing stability. Despite these challenges, Susanna displayed talent and determination from a young age. She studied piano and later pursued vocals and solfeggio at the State Song Theater of Armenia, hoping to become a singer. (Exhibit B, diploma and stage photos of singing career.) Her dreams were disrupted when her father's involvement in politics brought persecution and violence upon the family. After witnessing repeated injustices against

her father and experiencing abuse herself as a political activist, Susanna and her family fled first to Russia and later sought asylum in the United States in search of safety and peace.

**Family and Personal Life:**

In 2009, Susanna arrived in Los Angeles, determined to start anew. She worked, attended college, and soon met her husband, Mihran, who had a young daughter, Christina. (Exhibit C, marriage certificate.) Having grown up without a mother, Susanna embraced Christina as her own, providing the love and care she herself had longed for as a child. In time, Susanna and Mihran were blessed with a daughter of their own, Amy, who became the center of her life and the driving force behind her strength and perseverance. Amy is now 12 years old. (Exhibit D, photographs of Amy.)

Miss Harutyunyan devoted most of her time and energy to being a mother and providing a stable, nurturing environment for her child. Her primary focus in life was her daughter's well-being, education, and emotional development. Funds received from her husband were used, in part, to support her child's needs and education, reflecting her commitment to providing a better future for her. Miss Harutyunyan's priorities remained centered on motherhood and ensuring her daughter's growth, stability, and success. Her child's upbringing was, and continues to be, the most important aspect of her life.

When her husband began using drugs and became unreliable, Miss Harutyunyan took on the responsibility of providing for the household while continuing to raise their child. (Exhibit E, a 2 page exhibit depicting make-up and aesthetics career and licenses.) While she still deferred to her husband for financial decisions, she had to work on her own to make ends meet during this horrible time in her life. Her resilience and unwavering focus on her family's well-being reflect her strength of character and her deep commitment to her role as a mother and provider.

**Circumstances of this offense:**

During the time of the instance offense, Miss Harutyunyan was a wife in a traditional sense. Her role within her marriage was deeply traditional and subordinate. Throughout the relationship, she relied on her husband for all financial and personal decision-making, having

4

been conditioned to defer to his authority and judgment. Her husband exercised exclusive control over the couple's finances and household affairs, and she was neither expected nor encouraged to question his actions. Consistent with long-established family dynamics and her own upbringing, she trusted and followed his direction in all matters, believing it was both appropriate and expected of her. As a result, she played no active or independent role in the financial conduct at issue and acted solely out of reliance on her husband's control and guidance.

Although she ultimately became aware that her husband was engaged in illegal activity, she did not question him for several reasons. She had been conditioned by the nature of their relationship not to challenge his authority, and she was also experiencing, for the first time, a sense of financial stability and security that she had long lacked. While she acknowledges her fault in allowing his conduct to continue, her involvement was limited, and she did not play a major or directing role in any of the criminal activities at issue.

Miss Harutyunyan takes full responsibility and accountability for her actions as noted and acknowledged by the probation offer and his notes in the PSR. Additionally, Miss Harutyunyan has provided a statement for this court. (See Exhibit F.)

### III.

### **MEMORANDUM OF POINTS AND AUTHORITIES**

Title 18 U.S.C. § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing. In considering § 3553(a) factors, a court may consider formerly discouraged factors or facts that would not have met pre-Booker standards for departures. See United States v. McBride, 434 F.3d 470, 476 (6th Cir. 2006) ("Now, because the Guidelines are no longer mandatory and the district court need only consider them along with its analysis of the section 3553(a) factors . . . many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court–with greater latitude–under section 3553(a)."); see also United States v. Booker, 543 U.S. 220, 301 (2005) (Stevens, J., dissenting) ("[T]here can be no 'departure' from a mere suggestion.").

As set forth below, with the appropriate corrections in the calculation of applicable levels and all § 3553(a) factors, considered together, warrant a sentence substantially less than that recommended by the probation department and the Guidelines range.

### A. THE GOVERNMENT HAS PRESENTEND AN INFLATED AMOUNT OF LOSS UNDER U.S.S.G. §2B1.1(b)(1)(H)

**1. Legal Standard**

Under U.S.S.G. §2B1.1(b)(1), the offense level is increased according to the amount of loss. The Guidelines define 'loss' as the greater of actual loss or intended loss, but the determination must be reasonably supported by the evidence and not speculative. See United States v. Santos, 527 U.S. 533 (2008); United States v. Confredo, 528 F.3d 143 (2d Cir. 2008). 'Loss' under §2B1.1 must reflect pecuniary harm to victims. It does not automatically equate to the total amount of funds involved in the transaction, particularly where the defendant did not personally benefit or intend that entire amount to be lost. See United States v. Chatterji, 46 F.3d 1336 (4th Cir. 1995).

**2. Improper Reliance on the Value Laundered**

The Presentence Investigation Report (PSR) appears to base its enhancement on the total value of funds laundered, applying §2B1.1(b)(1)(I) for a loss exceeding $550,000. However, this approach conflates 'value laundered' under §2S1.1(a)(2) with 'loss' under §2B1.1. The Commentary to §2S1.1 instructs that when the defendant is convicted under 18 U.S.C. §1956 or §1957, the base offense level should be derived either from §2B1.1 (if the defendant committed or was accountable for the underlying offense) or from the value of the funds laundered, whichever is greater. This means that loss and value laundered serve different analytical purposes—one measures harm to victims, the other measures scope of laundering conduct.

Where the government cannot show that the entire amount laundered constituted loss—for example, where funds were recovered, represented legitimate proceeds, or were circulated but not dissipated—using the total laundered value overstates the seriousness of the offense.

The government claims that $2,822,963 in fraudulent proceeds were transferred into accounts and assets Harutyunyan controlled, which represents the amount she laundered and the total loss. This amount is incorrect and inflated. This amount is attributable to codefendants, but not Miss Hartunyan, who had very little knowledge of what this scheme represented and how it was operated. The parties agree that Harutyunyan laundered at least **$1,141,870** in criminally derived proceeds because she had knowledge that these funds came from an illegal activity committed by her husband. But she didn't know more than that and was not involved with more than that.

The amounts Miss Harutyunyan was aware of are detailed out in the Government's sentencing motion in Exhibit B highlighted in gray.  The amounts separately are: $391,960, $227, 220, $418,000, $4,970, $7,320, and $92,400. These amounts total the $1,141,870 value that was stipulated in the plea agreement and highlighted in gray in the Government's Exhibit B. Miss Harutyunyan had no knowledge of where the other funds came from and what they represented.  The government is aware that her husband, codefendant Mr. Panosyan who is now in custody, controlled all the transactions.

Special Agent Pforr's details all the transactions that have ever occurred with not only Miss Harutyunyan and her knowledge, but all of what her husband, Mr. Panosyan, Mr. Fichidzhyan, Mr. Srapyan, and Mr. Esparza had been involved with and plead guilty to.  The agent's explanation also includes an assertion that Miss Harutyunyan used certain shell companies to launder funds from the health care fraud scheme. However, there is no proof that Miss Harutyunyan had personal knowledge of where this money was coming from or that she even signed any documents herself that would depict knowledge of her actions.

While Miss Harutyunyan may have allowed her husband to sign on her behalf and use her name in all the transactions he was involved in, she had no personal knowledge of amounts and what was or was not derived from illegal funds.  Often times, her husband would ask her to

sign documents that she did not know contained accurate or inaccurate information and did as she was asked without asking questions.

The government attempts to make Miss Harutyunyan as culpable as her husband because Harutyunyan admitted in her plea agreement that she knew there were funds being received that came from a fraudulent activity. This is a gigantic leap in assumption when there exists no evidence to support such a deduction. Harutunyan agreed to an amount she could comprehend based on the proceeds that she knew went into the homes that were obtained in her name and certain amounts that went into her kid's education expenses and vehicles. Beyond what she knew, she had no control and deeper knowledge of. She had no control over the deposits and transfers that were being done by her husband who did not share with her the details of his actions. The Table provided by the government in Exhibit B simply details out what the government believes went into accounts that bore her name with no proof of actual knowledge on her part.

Mr. Panosyan used the trust and the traditional family dynamic of his subordinate wife to carry out transactions that Miss Harutunyan would not even fathom or have an understanding of. She is simply not that business savy and allowed her husband full control of her name and financial decision making.

**3. Amount of Loss Not Reasonably Estimated**

The government bears the burden of proving loss by a preponderance of the evidence. Speculative or aggregated calculations are impermissible. See United States v. Geevers, 226 F.3d 186 (3d Cir. 2000) ('Loss estimates must be grounded in the facts of the case and supported by reliable evidence.').

In this case, not all funds alleged were proceeds of unlawful activity. Some transactions were return or circular transfers, not actual loss. Portions of the funds were seized or returned, further reducing actual loss. Accordingly, the PSR's reliance on the gross value laundered produces an inflated and legally incorrect loss figure.

For example, here there were $75,447.75 in funds seized from banc of California, another $2,626,324 seized from another Banc of California account, the real property located at 16817 Rayen Street in Northridge was forfeited, $218, 571.07 in funds seized from Chase Bank, and a 2019 Mercedez Benz Vehicle seized as forfeited property.  The government has seized almost all the proceeds that Miss Harutyunyan would have been responsible for and additional proceeds that her codefendants were responsible for.

**4. Request for Correction**

The Defendant respectfully requests that the Court: 1. Reject the +16 level enhancement based on §2B1.1(b)(1)(I) purported loss figure since the loss was less than $1,500,000.00, which should only add a 14 level enhancement;  2. Recalculate the total offense level using only verifiable pecuniary loss supported by evidence; and 3. Apply a reduced enhancement consistent with the accurate loss range. Applied correctly, the base offense level becomes 8+14, which is level 22.  (

## B. MISS HARUTYUNYAN'S MITIGATING ROLE WARRANTS A 4 LEVEL REDUCTION  UNDER U.S.S.G. §3B1.2(a)

**1. Legal Standard**

Under U.S.S.G. §3B1.2(a), a defendant who is plainly among the least culpable of those involved in the conduct of a group is entitled to a 4-level reduction as a 'minimal participant.' Alternatively, §3B1.2(b) provides a 2-level reduction for those who are 'minor participants,' less culpable than most other participants but not minimal.

The Application Notes to §3B1.2 direct courts to consider: (1) the degree to which the defendant understood the scope and structure of the criminal activity; (2) the degree to which the defendant participated in planning or organizing the activity; (3) the degree to which the defendant exercised decision-making authority; (4) the nature and extent of the defendant's participation; and (5) the degree to which the defendant stood to benefit from the criminal activity. (See U.S.S.G. §3B1.2, comment. (n.3(C)) (2018)).

## 2. The Defendant's Minimal Role

The Defendant's involvement was limited, subordinate, and peripheral to the broader scheme. The Defendant had no decision-making authority, was not involved in planning or organizing the offense, and followed instructions from higher-level participants. The Defendant did not share in significant profits or proceeds and had minimal understanding of the broader operation.

Courts consistently recognize that couriers, intermediaries, or low-level participants often warrant the 4-level reduction. See United States v. Rodriguez De Varon, 175 F.3d 930 (11th Cir. 1999); United States v. Sarmiento-Perez, 724 F.2d 898 (11th Cir. 1984). The inquiry focuses on the defendant's relative culpability, not merely the offense conduct.

## 3. Application to This Case

Here, the Defendant's conduct fits squarely within the definition of a minimal participant. The Defendant had limited knowledge of the broader operation, performed tasks at the direction of others, received little or no financial gain, and was easily replaceable within the scheme. The Sentencing Commission has emphasized through Amendment 794 (Nov. 1, 2015) that this adjustment should be applied more frequently to ensure fairness and proportionality in sentencing.

The government knows that Miss Harutyunyan's husband, Mr. Panosyan and his codefendants participated together meeting at residences to carry out a fraud scheme. Miss Harutyunyan was the pawn whose name was used in carrying out what she could not even comprehend. Being a traditional wife, she did what she was told and completely trusted her husband to take on the financial decision making. If he told her to sign a document, she did without question. If he directed her to agree to present a document, she followed. She never initiated, planned, or participated in any kind of fraud scheme other than allowing these activities to go on in her name. When she realized what her husband was doing was illegal, she stayed quiet and allowed it to go on.

This does not mean she understood the full scope or structure of the criminal activity. There is absolutely no proof that she planned or organized any activity. There is not proof she ever exercised any decision making authority. Her participation was silently allowing activities to take place using her identity and her name. And her benefit was only limited to the amount that she understood to be illegal, which was the $1,141,870 she eventually understood was illegally obtained.

To add, during this entire scheme that the codefendants carried on, Miss Harutyunyan was employed full time carrying on her make up and skin care business. She was not only not a part of the decision making, but she was physically unable to be a part of it. Miss Harutyunyan was a traditional wife, who benefited from her husband's criminal conduct and stayed quiet. That makes her role an absolutely minimal one.

**4. Request for 4-Level Reduction**

Given the Defendant's minimal participation, the Court should apply the 4-level reduction under §3B1.2(a). This adjustment accurately reflects the Defendant's limited culpability, ensures proportional sentencing, and aligns with the factors set forth in 18 U.S.C. §3553(a)—to impose a sentence that is sufficient but not greater than necessary.

A four-level reduction would mean Miss Harutyunyan would be at Level 19, (22 +1 (for transactional money laundering, and -4 for minimal participation). There would also be a 5-level decrease based on acceptance of responsibility and a 0 point offender adjustment, bringing the final offense level to 14.

**C.  EXTRAORDINARY FAMILY CIRCUMSTANCES WARRANT A DOWNWORD DEPARTURE**

The Defendant also respectfully moves this Court for a downward departure pursuant to U.S.S.G. §5H1.6 and 18 U.S.C. §3553(a), or in the alternative, a variance from the advisory guideline range. The Defendant is now the sole custodial parent and primary caregiver of a minor

child, aged 11. The child's other parent is now incarcerated, leaving the Defendant as the only source of daily care, financial support, and emotional stability.

Incarceration would impose extraordinary harm upon this child, including potential foster care placement, loss of stability, disruption of education, and significant emotional trauma. The Defendant has maintained lawful employment, complied with pretrial supervision, and poses no danger to the community.

Additionally, it is almost certain that Miss Harutyunyan will be deported after the conviction in this case, this means that little Amy is already facing losing her life here in the United States and moving to another country to start a new life because of her parents. (Exhibit G, letter from immigration attorney.)  However, staying alone without either parent and then moving to a new country at this age is more than just difficult, it is unnecessarily harsh.

While family circumstances are not ordinarily grounds for departure under U.S.S.G. §5H1.6, courts have recognized that extraordinary circumstances may justify such relief when incarceration would cause substantial harm to dependents. See United States v. Johnson, 964 F.2d 124 (2d Cir. 1992); United States v. Galante, 111 F.3d 1029 (2d Cir. 1997).

Accordingly, the Defendant respectfully requests that the Court impose a non-custodial sentence or a significant downward departure/variance, consistent with the purposes of sentencing under 18 U.S.C. §3553(a): to impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of punishment, deterrence, and rehabilitation.

### D. 18 U.S.C. § 3553(a)(6) FACTORS CONCERNING SENTENCING DISPARITY WARRANT A SENTENCE OF 15 MONTHS OR LOWER

18 U.S.C. § 3553(a)(4) & (5) now merely require the Court to take the sentencing guidelines as "advisory." And to consider any additional policy guidelines. 18 U.S.C. § 3553(a)(6) requires the Court to minimize sentencing disparity among similarly situated defendants.

The government provides statistics of the number of hospices that exist in Southern California to show the court the impact of frauds committed involving hospice companies. The

government is essentially asking the court to punish this defendant, Ms. Harutyunyan, for possible actions of thousands or hundreds of other people in order to make an example of her. The government is also focusing on the total fraud value in this case knowing that Ms. Harutyunyan had nothing to do with the Hospice Fraud scheme. This Court has already punished and sentenced the true identity behind the Hospice Fraud Scheme, defendant Fichidzhyan and for the larger laundering schemes, Mr. Panosyan, Mr. Srapyan, and Mr. Esparza. The government never charged Ms. Harutyunyan with hospice fraud because the government is aware that Ms. Harutyunyan was not involved with it. The Government is hoping that Fichidzhyan's and his codefendants' actions would impact this Court to impose a harsher punishment on Ms. Harutyunyan regardless of her true involvement.

      Miss Harutyuyan is asking the court for a sentence of 15 months or less based on her offense level being appropriately calculated at level 14. To explain why that sentence would fit appropriately with similarly situated defendants, the Judiciary Sentencing Information provided the following statistics:

      During the last five fiscal years (FY2020-2024), there were 39 defendants whose primary guideline was §2S1.1, with a Final Offense Level of 20 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 34 defendants (87%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 27 month(s) and the median length of imprisonment imposed was 27 month(s).

      During the last five fiscal years (FY2020-2024), there were 34 defendants whose primary guideline was §2S1.1, with a Final Offense Level of 16 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure.  For the 30 defendants (88%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 14 month(s) and the median length of imprisonment imposed was 15 month(s).

      During the last five fiscal years (FY2020-2024), there was an insufficient number of defendants (1) whose primary guideline was §2R1.1, with a Final Offense Level of 14 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure; and (2) who received a sentence of imprisonment in whole or in part.

Based on the fact that those defendants that had a final offense level of 16 received an average of 15 months of incarceration and absent additional statistics for those facing level 14, Miss Harutyunyan asks this court for a sentence of level 15 months or less.

Finally, it is important to note that the government has agreed not to appeal any sentence of the Court provided that the court uses level 14 or higher. Level 14 includes a 15-month sentence, which the government understands can be properly applied in this case.

## IV

## CONCLUSION

Based on the foregoing, the defendant respectfully requests that the minimum possible legal sentence be imposed. Understanding that he may be unable to contribute to the immediate future wellbeing of his children and family members, he is determined, to do all in his power to maintain the family unit and reassume the role of primary caregiver.

The defendant remains willing to comply with any sentence, special assessments, penalties and conditions, that the Court sees fit to impose.

Dated: November 9, 2025

Respectfully submitted,

_____
Mariya Melkonyan
Attorney for Susanna Harutyunyan